**AMERICAN ENERGY CORPORATION et al., Appellees,**

v.

**DATKULIAK et al., Appellants.**

[Cite as *Am. Energy Corp. v. Datkuliak,* 174 Ohio App.3d 398, 2007-Ohio-7199.]

Court of Appeals of Ohio,
Seventh District, Monroe County.

No. 07 MO 3.

Decided Dec. 28, 2007.

Michael Shaheen;  and John Jevicky, William Mattes, and Jeffrey Willis, for appellees.

Richard Yoss and Jason Yoss, for appellants Charles and Beverly Datkuliak.

David Detec, urging reversal for amici curiae Ohio Farm Bureau and the Monroe County Farm Bureau.

Paul Gerig and Christian Gerig, urging reversal for amicus curiae Ohio Oil and Gas Association.

VUKOVICH, Judge.

{¶ 1} Defendants-appellants, Charles and Beverly Datkuliak ("the Datkuliaks"), appeal the decision of the Monroe County Common Pleas Court holding that plaintiffs-appellees American Energy Corporation ("AEC") and Consolidated Land Company ("CLC") have the right to mine the Pittsburgh No. 8 vein of coal below the Datkuliaks' property and that the Datkuliaks have to cap and plug their gas well that lies within the coal-mining area. This appeal presents four issues. The first is whether the appeal is moot. The second issue is whether the trial court correctly interpreted the relevant deeds at issue to determine whether AEC and CLC were entitled to all the coal and whether the Datkuliaks had to plug and cap their well. The third issue is whether the trial court erred in excluding expert testimony. The final issue is whether the trial court's decision constituted a governmental taking for which compensation must be given. For the reasons stated below, we find that the appeal is moot. However, even if the merits are addressed, we find no error with the trial court's determination.

## STATEMENT OF FACTS

{¶ 2} The Datkuliaks own a parcel of property located in Sunsbury Township, Monroe County, Ohio. They own the surface estate and the oil-and-gas estate. CLC, however, owns the coal estate.

{¶ 3} The coal estate was first severed from the surface estate in 1922 by a deed ("coal-severance deed"). This deed states that the grantors sold "ALL the COAL commonly known as the Pittsburgh Vein and geologically known as SEAM Number Eight (8)." (Emphasis sic.) The coal-severance deed then goes on to state:

{¶ 4} "Together with the right and privilege to mine all of said coal without reservation or liability for damages that may arise by reason of mining said coal or the operation of said mine or mines to the surface or to the improvements upon the surface over said coal, or to any waters or waterways situated upon or on said premises, and the right to use any and all entries, and other passage ways under said lands for the purpose of transporting and mining coal from adjoining and contiguous territory; and together with the right and privilege to use the necessary surface over said coal for the purpose of erecting, constructing and maintaining the necessary air shafts to ventilate mines for the removing of said coal and coal from adjoining and contiguous territory, said air shafts to be kept in such repair and so guarded by said Grantees, their heirs and assigns, as not to endanger stock on said premises; and together with the right to enter upon described premises at all reasonable times to make necessary surveys, or to drill or examine said coal, in any reasonable manner."

{¶ 5} The next paragraph of the deed contains a reservation for the surface estate to drill and operate a gas or oil well. It states:

{¶ 6} "Said Grantors reserve unto themselves and their heirs and assigns the right to drill and operate through said Vein of coal for oil, gas, and any and all other minerals."

{¶ 7} After a number of conveyances, this coal estate was bought by Youghiogeny and Ohio Coal Company ("Y & O"). In 1995, Y & O sold this coal estate, along with other coal estates, to CLC by deed ("Y & O deed"). The Y & O deed conveyed all the remaining coal in multiple tracts of land that were described more accurately in an exhibit attached to the deed. CLC leased the coal estate to AEC in 2003 for purposes of mining the coal.

{¶ 8} In 2006, AEC's land manager contacted the Datkuliaks and informed them that they were going to mine beneath their land. AEC wanted to discuss the capping and plugging of a gas well that was located on the Datkuliaks' property. The gas well in question was drilled in 1989 and was a functional and operating gas well that the Datkuliaks used to provide gas to heat the buildings on the property.[1] The gas well was drilled to a depth of 2,740 feet below the surface. The Pittsburgh No. 8 seam is located approximately 580 feet below the surface. Thus, piping from the gas well lies within the coal seam. In order to mine all the coal, as AEC wanted, the well had to be capped and plugged.

{¶ 9} It appears that there were attempts to negotiate an agreement as to capping and the plugging of the well. At some point during the negotiations, AEC filed an application with the Division of Mineral Resources ("the division") to cap and plug the well. That application was denied because AEC was not the owner of the well. Negotiations then fell through and legal action was taken in the Monroe County Common Pleas Court.

{¶ 10} AEC and CLC filed a declaratory-judgment action seeking an order that stated that they are entitled to mine all the coal within the coal estate that they owned and that the Datkuliaks must cap and plug their well. They also sought a permanent and preliminary injunction. The Datkuliaks filed a complaint for declaratory judgment the following day, asking the court to declare that they did not have to cap and plug the well and that AEC and CLC's right to mine the coal was not paramount to their right to the gas.

{¶ 11} The trial court consolidated the actions. The case proceeded through expedited discovery, and a trial before the bench occurred on June 27, 2007. It is noted that in addition to the declaratory-judgment actions, the record reveals that

---

1. Oxford Oil Company drilled the well. In 1990, it sold the well to the Datkuliaks for $3,000.

both parties filed a claim for slander of title against the other. Those claims were severed from the trial and thus are not a matter before this court.

{¶ 12} At trial, the parties agreed that their respective rights were governed by interpretation of deeds. Specifically, did the language in the coal-severance deed indicate that AEC and CLC have the right to all the coal in the coal estate and thus have the right to have the well plugged and capped, or did the language indicate that once the well was drilled, the coal mining must go around the well?

{¶ 13} AEC and CLC argued that their estate to the coal is to all the coal, and if the well is in their way, it must be capped. The Datkuliaks argued that the language in the coal-severance deed indicates that they have the right to drill and operate a well through the vein of coal. Furthermore, since the deed does not contain any language stating that the well cannot interfere with mining, this indicates that the coal estate is not paramount to the gas estate. Thus, the Datkuliaks have no obligation to cap and plug the well. To support this argument, they referenced the other tracts of land that were sold in the Y & O deed that contained reservations that an oil or gas well could not interfere with mining. They argue that these tracts in the Y & O deed should also be considered in conjunction with the coal-severance deed to determine the rights of the parties.

{¶ 14} Also at the trial, the Datkuliaks attempted to offer expert evidence from three attorneys as to what the language of the deeds meant. The trial court did not allow the testimony of the first attorney because he testified that the language in the deed was not ambiguous. The Datkuliaks then proffered testimony as to what this attorney would testify. The other two attorneys were, however, permitted to testify. Yet, when the second attorney was asked whether or not he would advise an oil or gas client to drill, given the language in the deed, the trial court did not allow the answer. The Datkuliaks then proffered testimony. The third attorney was permitted to testify, but he was not permitted to answer a question that asked him to compare the reservation at issue with other reservations he had seen in coal-severance deeds. Once again, the Datkuliaks proffered testimony.

{¶ 15} Within weeks of the trial, the trial court granted the declaratory judgment for AEC and CLC. The court considered the coal-severance deed and stated that it found the language to be clear and unambiguous. It then stated:

{¶ 16} "More specifically, the coal severance deed, from which Plaintiffs are successors in interest, clearly provides that the owner of the coal estate has a right to mine all of the coal in the No. 8 seam. The deed goes on to provide that the right to mine said coal shall be without liability for damages.

{¶ 17} "In the case at bar, this Court holds that the right to mine said coal, 'without reservation or liability for damages * * * to the surface or to the improvements upon the surface * * * or to the water or waterways upon said premises * * * constitutes a complete, clear waiver.' See *Ohio Valley Coal Co. v. E. Ohio Gas Co.* (1992), Belmont C.P. No. 91–CIV–210 [1992 WL 12579867], citing *Wells v. AEP [American Electric Power], Co.*, 48 Ohio App.3d 95, 97–98 [548 N.E.2d 995] (1998) [1988]."

{¶ 18} It then indicated that AEC and CLC are not liable for any damages to the Datkuliaks' surface right. The trial court further added that based on the coal-severance deed, the existence of the gas well diminishes and sterilizes the coal owner's right to mine the coal. Thus, it held that the reservation clause does not conflict with or diminish the coal company's right to mine all of its coal without liability for damages. The trial court then ordered the Datkuliaks to immediately plug and cap the gas well.

{¶ 19} The Datkuliaks appeal from that order. This appeal was placed on a prompt-consideration calendar. No stay was requested in the trial court or in this court. At oral argument, the parties acknowledged that the well had already been capped and plugged. Furthermore, it was also indicated at oral argument that mining was going to commence through the area where the well was within weeks.

## MOOTNESS

{¶ 20} As stated above, this is an appeal from a declaratory-judgment action that was based on the interpretation of a deed, specifically the coal-severance deed. Both parties were seeking their own declaration from the court. The Datkuliaks sought a declaration that they are the owners of the gas well and that they "have no obligation to plug or cap the well." They also sought a declaration that AEC's coal rights are not paramount to the Datkuliaks' right to own and maintain the well. AEC sought a declaration that they are entitled to mine all the coal without interference from the Datkuliaks and that the Datkuliaks must plug the well.

{¶ 21} The trial court, in interpreting the deed, found that AEC was entitled to mine *all* the coal and that the Datkuliaks, owners of the well, had to plug and cap the well. As stated above, the decision was appealed; however, a stay was not requested. Thus, the well is capped and plugged, and coal mining has gone through the area where piping for the well was located.

{¶ 22} The Datkuliaks argue in this appeal that the trial court's interpretation of the coal-severance deed was incomplete because it did not also consider the Y & O deed. Further, they argue that the trial court's interpretation of the deed

was incorrect; the deed did not make the right to the coal paramount to the right to operate the functional gas well. Thus, they are asking this court to reverse the trial court's declaration.

{¶ 23} While this court does have jurisdiction to review the trial court's declaration, if we would find that the trial court was incorrect in its judgment, our decision would have no impact. As already stated, the well has been capped and plugged, and coal mining has already occurred in that area. Any decision by this court that AEC is not entitled to all the coal and that the well is not to be capped and plugged cannot be carried into effect. Thus, the issue is not a justiciable controversy.

{¶ 24} " 'The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it. It necessarily follows that when, pending an appeal from the judgment of a lower court, and without any fault of the defendant, an event occurs which renders it impossible for this court, if it should decide the case in favor of the plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment, but will dismiss the appeal. And such a fact, when not appearing on the record, may be proved by extrinsic evidence.' " *Miner v. Witt* (1910), 82 Ohio St. 237, 238, 92 N.E. 21, quoting *Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293.

{¶ 25} Other appellate districts have held, in declaratory-judgment actions involving deed interpretation for the construction of buildings, that if a stay is not obtained and construction commences, the appellate court will not render a decision on the merits because the cause is moot. One such case is *Pinkney v. Southwick Invests., L.L.C.,* 8th Dist Nos. 85074 and 85075, 2005-Ohio-4167, 2005 WL 1926507.

{¶ 26} In *Pinkney,* residents of Shaker Heights filed a declaratory action seeking a declaration that Southwick could not develop four lots of land for use other than single-family homes. The residents contended that the deeds to the lots in question and a restrictions document limited the use of the property to single-family homes. As to three of the lots, the trial court found that there were not any restrictions in the title. As to the fourth lot, it found that the restrictions for single-family use applied. The residents appealed and Southwick cross-appealed.

{¶ 27} In Southwick's cross-appeal, they contended that as to the three lots that the trial court found that the restrictions did not apply, the residents could not argue that the decision was incorrect because they failed to obtain a stay

from the trial court's order and the construction on the properties had already commenced. The Eighth District agreed and found that any argument as to those three lots was moot. It stated that as a general rule, courts will not resolve issues that are moot. The Eighth District then explained that Southwick had submitted an affidavit which verified that the construction of the lots was substantially complete, although it was not fully completed. Thus, it deemed the arguments as to those three lots moot. In support of its decision, it cited to the Ninth District Court of Appeals, which held:

{¶ 28} "[W]here an appeal involves the construction of a building or buildings and the appellant fails to obtain a stay of execution of the trial court's ruling and construction commences, the appeal is rendered moot." *Schuster v. Avon Lake*, 9th Dist. No. 03CA008271, 2003-Ohio-6587, 2003 WL 22900636.

{¶ 29} *Schuster* involved a city resident that sought declaratory relief against the city after it passed an ordinance that approved a planned-unit development. The trial court denied the relief requested. The resident did not seek a stay of execution of the ruling of the trial court. At oral argument, it was revealed that construction had begun at the development. Thus, the Ninth District held that since construction was occurring and there was no request for a stay, the appeal was moot.

{¶ 30} Other districts have held similarly, although these cases do not involve declaratory judgments. The Second District has found that when construction has been completed or substantially completed, the appeal is moot. *Bd. of Commrs., Montgomery Cty. v. Saunders* (Nov. 2, 2001), 2d Dist. No. 18592, 2001 WL 1346087. In that case, the board of commissioners sought easements on a landowner's real property in order to construct drainage improvement. The trial court granted the easements. Six months after that grant, while the appeal was pending, the landowner sought to enjoin the board from proceeding with the project. The trial court denied the request. The landowner sought no other recourse for the denial of the motion to enjoin. On appeal, the Second District found that the argument as to the grant of the easements was moot. In coming to this conclusion, they cited a prior case where a variance was granted to build a garage and the neighbors who objected to the variance did not apply for a stay. The Second District in that instance also found the appeal to be moot. Id.

{¶ 31} The *Saunders* court further explained that it was at a loss to determine what relief the landowner sought since the work that it would have the court prevent had already been completed. It stated, "It would be nonsensical for us to require that the replacement drainage tiles be removed and the work be undone in order to cure the error assigned." Id.

{¶ 32} Likewise, the Tenth District has come to the same conclusion. *Nextel W. Corp. v. Franklin Cty. Bd. of Zoning Appeals,* 10th Dist. No. 03AP–625, 2004-Ohio-2943, 2004 WL 1244339. Nextel sought a conditional-use request with the zoning board, which was denied. Nextel appealed to the trial court. The trial court found that the zoning board lacked jurisdiction to require a conditional-use permit for the construction of the telecommunications facility. That decision was appealed by the zoning board and nearby residents to the Tenth District Court of Appeals. Neither party approved of the tower. That said, neither the zoning board nor the residents requested a stay of the lower court's ruling. After the appeal was filed, Nextel filed a motion to dismiss the appeal on the basis of mootness because the tower was already completed. The Tenth District concluded that due to the failure to request the stay and the construction of the tower, the appeal was moot. Id.

{¶ 33} We find the above cases and their holdings to be applicable to the situation at hand. Admittedly, the case at hand deals with mining and not construction. However, that distinction is insignificant. At its heart, this case is a deed-interpretation case, similar to *Pinkney,* which was also a deed-interpretation case. Furthermore, as in the above cases, the event that the Datkuliaks were seeking to prevent—the capping and plugging of the well and the removal of the coal—has occurred. This court cannot logistically order AEC to put the coal back in the ground and uncap the well. Thus, if we viewed the trial court's decision as erroneous, there is no relief we could grant to the Datkuliaks. Consequently, as with the above cases, this case is moot.

{¶ 34} This court is aware that it is vested with jurisdiction to address moot issues that are capable of repetition yet evade review or issues that involve an important public right or interest. *Citizens Word v. Canfield Twp.,* 152 Ohio App.3d 252, 2003-Ohio-1604, 787 N.E.2d 104, ¶ 8. The issue presented before this court, however, does not fall under either one of those exceptions. The issue does not evade review. Had a stay been requested and granted pursuant to App.R. 7, the issue would not have been moot and thus would not have evaded review. See *McCarthy v. Lippitt,* 7th Dist. No. 04MO1, 2004-Ohio-5367, 2004 WL 2334323, ¶ 38. Furthermore, the issue does not involve a great public interest or right. In its simplest terms, this is a deed-interpretation case. Deed interpretation is not a matter of great public interest for purposes of mootness.

{¶ 35} It is noted that at oral argument, the Datkuliaks at one point focused on the fact that they had to pay for the capping and plugging of their well and were of the opinion that AEC should have been ordered to pay for that. However, this argument was not presented in their appellate brief. They do argue that the trial court's order constituted a taking under the Fifth and Fourteenth Amendments to the United States Constitution because they were

not compensated for the taking. However, it is an enormous stretch to find that that argument concerns the cost of capping and plugging. In that argument, they never reference the cost of capping or plugging.

{¶ 36} Furthermore, at the bench trial, the Datkuliaks did not argue that the cost of capping or plugging the well, if it was required to be done, should be paid for by AEC. At trial, testimony concerned who owned the surface rights, who owned the coal rights, who owned the well, the amount of money that would be lost if the coal company could not mine all the coal, and an attempt to show the interpretation of the coal-severance deed. No testimony was offered as to the cost of capping and plugging the well.

{¶ 37} Moreover, the declaration they sought concerning the capping and plugging of the well was that they were not required to do so. Thus, the cost of capping and plugging the well was never sought from the trial court.

{¶ 38} At its simplest terms, the issue before the trial court was whether or not the deed entitled the coal company to mine all the coal without interference from the Datkuliaks' well. If the deed permitted that, then the well had to be plugged and capped, and the coal mining could go through where the well was located. If the deed did not permit that, then the coal mining would have to occur around the well or the mining company would have to reach some monetary or other type of satisfactory agreement with the Datkuliaks about mining through the well. No argument was made to the trial court that the Datkuliaks should be entitled to monetary compensation if the deed did permit AEC to mine through the well. All that was sought was a declaration that the Datkuliaks did not have to cap and plug the well and that AEC's right to mine was not paramount to their right to operate the gas well. Consequently, because compensation for the well or the capping of it was not argued to the trial court, it is not properly before this court. Thus, we will not address that issue.

{¶ 39} In conclusion, the appeal is moot. However, in the interests of justice, we will address the merits.

## FIRST ASSIGNMENT OF ERROR

{¶ 40} "The trial court erred in its determination that appellees' right to mine the coal in the affected area of Section 36 of Sunsbury Township is paramount to appellants' right to continue to operate their gas well, which has existed and produced natural gas since 1989."

{¶ 41} The Datkuliaks contend that the trial court did not consider all the appropriate deeds in determining that AEC and CLC have the right to mine all the coal and are not required to go around the Datkuliaks' gas well but instead may go through it. They argue that the trial court's decision should not have

relied solely on the coal-severance deed, but should have also considered the Y & O deed.

{¶ 42} As explained earlier, the coal-severance deed is the deed that severed the coal estate from the surface and other mineral estates on the Datkuliaks' property. The Y & O deed is the deed through which Y & O sold all the remaining coal in multiple tracts of land to CLC. It states:

{¶ 43} " 'GRANTOR' * * * does hereby GRANT * * * and CONVEY with limited warranty covenants, to the Grantee, its successors and assigns, all of the remaining coal contained in or underlying the tracts of land more particularly described on Exhibit 'A', attached hereto and made a part hereof.

{¶ 44} "Together with such mining rights and other rights and privileges pertinent to the tracts set forth on Exhibit 'A'."

{¶ 45} One of the tracts sold in the Y & O deed contains a reservation that states:

{¶ 46} "The Grantors reserve the rights to bore or dig through said vein of coal for oil or gas, but such boring or digging shall not interfere with the mining or removal of said coal."

{¶ 47} The reservation in the coal-severance deed differs from the above reservation. It states that the grantors had the right to drill and operate through the coal for all other minerals, including gas and oil. It contains no qualification that digging, boring, or operating the well cannot interfere with coal mining.

{¶ 48} Despite the fact that the Datkuliaks admit that the coal-severance deed is clear and unambiguous, they assert that the language of the "shall not interfere with the mining" reservation should have been considered by the trial court when determining the rights of the parties under the coal-severance deed. They contend that when the two reservations are considered together, it is obvious that the "shall not interfere with the mining" qualification could have been made in the coal-severance deed. Because it was not, according to them, the language as it stands, without the qualification, means that the well can interfere with coal mining.

{¶ 49} AEC and CLC argue that the Y & O-deed qualification was properly not considered because it is extrinsic and irrelevant. They further contend that the original parties to that coal-estate qualification are not the same parties to the 1922 coal-severance deed at issue. Thus, the intent of the parties in the "shall not interfere with mining" qualification is irrelevant to show the intent of the language used in the coal-severance deed reservation.

{¶ 50} Considering the arguments, we cannot find error with the trial court's failure to consider the Y & O-deed reservation not applicable to the coal-

severance deed. The principles of deed construction dictate that a court presumes that a deed expresses the intentions of the grantor and grantee at the time of execution. *Parker v. Parker* (Sept. 28, 2000), 4th Dist. No. 99CA845, 2000 WL 1520046. A court cannot interpret the parties' intent in a manner contrary to the clear, unambiguous language of the deed. Id.; *Consol. Land Co. v. Capstone Holding Co.*, 7th Dist. No. 02BA22, 2002-Ohio-7378, ¶ 14. If an intention to convey land is apparent from an examination of the four corners of a deed, a court must give effect to that intention. See *Little Miami, Inc. v. Wisecup* (1984), 13 Ohio App.3d 239, 241, 13 OBR 292, 468 N.E.2d 935, citing *Hinman v. Barnes* (1946), 146 Ohio St. 497, 508, 32 O.O. 564, 66 N.E.2d 911. When determining the grantor's intent, a court must analyze the language used in the deed, "the question being not what the parties meant to say, but the meaning of what they did say, as courts can not put words into an instrument which the parties themselves failed to do." *Larwill v. Farrelly* (1918), 8 Ohio App. 356, 360.

{¶ 51} As all the above shows, one looks at the intention of the grantor and grantee *at the time of execution.* The intention of the grantor and grantees is drawn from the four corners of the deed if the deed is unambiguous. The issue in this case is the rights of the coal estate versus the rights of the surface and other minerals estate. The coal estate was severed by the 1922 coal-severance deed. The Datkuliaks admit that the coal-severance deed is unambiguous. If that is true, then there is no need to look beyond the language of that deed to determine the intention of the parties.

{¶ 52} The fact that Y & O sold this coal estate along with multiple other coal estates by one deed, with an exhibit attached that listed all the estates and their respective reservations, does not make the language in the other coal estates sold in that document relevant for the meaning of the coal-severance deed and its reservation. The surface-estate rights and the coal-estate rights in this case were established in the coal-severance deed. The "shall not interfere with mining" reservation used in one of the coal estates sold in the Y & O deed does not change those rights. The only thing for our consideration is the intention of the *grantor and grantee in the deed* that created the surface estate and coal estate rights, i.e., the coal-severance deed. Another deed by a different grantor and grantee using different language does not show the intention of the grantor and grantee in the coal-severance deed. Thus, we cannot find error with the trial court's failure to consider the reservation from the Y & O deed that was not applicable to the coal under the Datkuliaks' property.

## COAL–SEVERANCE DEED

{¶ 53} This leads us to the issue of whether the trial court properly determined the parties' rights under the coal-severance deed. The construction

of written contracts and instruments, including deeds, is a matter of law, which appellate courts review de novo. *Long Beach Assn., Inc. v. Jones* (1998), 82 Ohio St.3d 574, 576, 697 N.E.2d 208. As stated above, we presume that the deed expresses the intention of the grantor and grantee at the time that they executed the deed. *Parker*, 4th Dist. No. 99CA845, 2000 WL 1520046. When the language is clear and unambiguous, a court cannot interpret the parties' intent to the contrary.

{¶ 54} As aforementioned, the pertinent language in the coal-severance deed is as follows:

{¶ 55} "ALL the COAL commonly known as the Pittsburgh Vein and geologically known as SEAM Number Eight (8), in and under the following described tract of land: * * *.

{¶ 56} "Together with the right and privilege to mine all of said coal without reservation or liability for damages that may arise by reason of mining said coal or the operation of said mine or mines to the surface or to the improvements upon the surface over said coal, or to any waters or waterways situated upon or on said premises, and the right to use any and all entries, and other passage ways under said lands for the purpose of transporting and mining coal from adjoining and contiguous territory; and together with the right and privilege to use the necessary surface over said coal for the purpose of erecting, constructing and maintaining the necessary air shafts to ventilate mines for the removing of said coal and coal from adjoining and contiguous territory, said air shafts to be kept in such repair and so guarded by said Grantees, their heirs and assigns, as not to endanger stock on said premises; and together with the right to enter upon described premises at all reasonable times to make necessary surveys, or to drill or examine said coal, in any reasonable manner.

{¶ 57} "Said Grantors reserve unto themselves and their heirs and assigns the right to drill and operate through said Vein of coal for oil, gas, and any and all other minerals." (Emphasis sic.)

{¶ 58} The trial court found this language to be unambiguous and clear. In doing so, it relied on *Consol. Land Co.*, 7th Dist. No. 02BA22, 2002-Ohio-7378, and *Ohio Valley Coal Co. v. E. Ohio Gas Co.* (1992), Belmont C.P. No. 91–CIV–210, 1992 WL 12579867.

{¶ 59} The above language is clear that the grantee is entitled to *all* the coal in the Pittsburgh No. 8 seam. It is also apparent that the grantees are not liable for damages that occur to the surface or waterways from the mining and removal of coal. Also, the language of the deed clearly entitles the grantors to drill through the coal and operate a well for any or all other minerals.

{¶ 60} However, what must be determined is whether the grantors and grantees intended that the coal-estate owner was entitled to all the coal at the expense of the grantees' operation of the well.

{¶ 61} As stated above, the trial court relied on our decision in *Capstone* in making its determination. In *Capstone*, there was a dispute between the surface owners and the subsurface-coal owners of the same property. The surface estate wanted to construct and operate a construction and demolition-debris landfill. The coal estate wanted to prevent the construction of the landfill because it would interfere with its rights to mine coal beneath the surface. The trial court declared that the coal estate had the right to remove all the coal in the No. 8 coal seam. Furthermore, it enjoined the surface estate from constructing or operating the landfill. This court upheld that decision.

{¶ 62} The trial court and this court relied on the language in the three coal-estate deeds for the property to determine that the deeds granted "enormous entitlements" to the coal estate that allowed the coal estate to do whatever is necessary to mine all of the coal. *Consol. Land Co.*, 7th Dist. No. 02BA22, 2002-Ohio-7378, ¶ 27. Thus, the surface estate was prevented from operating the landfill.

{¶ 63} All three deeds in *Capstone* gave the coal estate "all" of the coal in the Pittsburgh No. 8 seam. The first and second *Capstone* deeds further provided:

{¶ 64} "Together with all the rights and privileges needful or useful to said Grantee, his heir and assigns, for digging, mining, draining, ventilating, removing and carrying away said coal * * *. Also * * * Grantors hereby waive any and all damages arising from the exercise of all and singular the rights and privilege herein before granted.

{¶ 65} "Grantors, their heirs or assigns, reserve the right to dig, drill, or bore through said coal for oil and gas, or other minerals, said digging, drilling or boring not to interfere with the mining of said coal."

{¶ 66} The third deed contained similar language indicating that the coal estate "waived all surface damages or damage of any sort arising therefrom, or from the removal of all of said coal." It also contained a clause that the drilling or boring for minerals could not interfere with the mining of the coal.

{¶ 67} This court viewed those deeds and stated:

{¶ 68} "As the trial court noted, the First, Second, and Third Deeds grant to appellees 'all' of the No. 8 coal in the specified estates. The First and Second Deeds further grant to appellees 'all the rights and privileges needful or useful' to mine the coal while the Third Deed grants appellees the right of way in such a manner that is 'proper and necessary' to mine the coal. These rights along with the waiver of damages provisions grant enormous entitlements to appellees. The

clear language of these Deeds provides that appellees may do whatever is necessary to mine all of their coal and appellants cannot stop the damage that may result." Id. at ¶ 27.

{¶ 69} This court further stated that the testimony leads to the conclusion that longwall mining is both needful, useful, proper, and necessary in order to mine the coal at issue. The evidence indicated that while longwall mining was not contemplated at the time the deeds were entered into, it is the only mining done in the Pittsburgh No. 8 seam and, furthermore, it is not only the economic way to remove the coal but it is also the safest method to use for the miners. Id. at ¶ 28–29.

{¶ 70} The deed before us is similar to the *Capstone* deeds in that *all* coal in the No. 8 seam is granted to the coal estate. Also, the deeds are similar in that each releases liability for damage to the surface estate caused by coal mining.

{¶ 71} The *Capstone* deeds, however, are different from the deed at hand because the *Capstone* deeds also relieve the coal estate of *all* liability for other damages. Despite AEC and CLC's insistence, the language in the deed at issue does not relieve them of *all* damage arising by reason of mining the coal. It only relieves them from liability for damages to the surface and waterways.

{¶ 72} The Datkuliaks assert that since the deed relieves liability from only the surface and waterways, it does not relieve the coal estate from damages to the oil or gas well. Thus, it is not the "enormous entitlement" that the *Capstone* deeds gave.

{¶ 73} While this court agrees that there are differences between the deeds in *Capstone* and in the case at hand, we cannot find error with the trial court's determination that AEC was entitled to mine all the coal. The coal-severance deed clearly entitled the coal estate to *all* the coal and released the coal estate from all liability to surface and waterways. They are also entitled to use all entry ways on the surface or under the land and they have the right to use the necessary surface for erection of ventilation devices to the mine. While this does not grant the "enormous entitlement" that was found in *Capstone,* it still grants a vast number of rights to the coal estate.

{¶ 74} Additionally, the Datkuliaks' right to operate a well appears to be a reservation, not an exception. A reservation by definition is a "creation of a new right or interest (such as an easement) by and for the grantor, in real property being granted to another." Black's Law Dictionary (8th Ed.2004) 1333. An exception is the "retention of an existing right or interest, by and for the grantor, in real property being granted to another." Id. at 604. By definition, if an exception was granted instead of a reservation, then the Datkuliaks would

have retained part of the coal estate where the well was drilled and thus AEC and CLC would not have been entitled to "all" the coal.

{¶ 75} "Although the terms 'excepting' and 'reserving' mean different things, the two terms are often employed 'indiscriminately.' *Ricelli v. Atkinson* (1955), 99 Ohio App. 175 [58 O.O. 305, 132 N.E.2d 123]. As a result, the terms employed, in and of themselves, do not definitively establish whether an exception or a reservation has been created. * * * Thus, 'whether the language creates a reservation or an exception depends upon the intention of the parties as evinced by a construction of the whole instrument in light of the circumstances of the case rather than upon the particular words used.' Id. at 179 [58 O.O. 305, 132 N.E.2d 123], citing *Gill v. Fletcher* (1906), 74 Ohio St. 295 [78 N.E. 433]; *Akron Cold Spring Co. v. Unknown Heirs of Ely* (1923), 18 Ohio App. 74. 'In case of doubt, it is said, the conveyance is to be construed most strongly as against the grantor, or in favor of the grantee on the theory, it seems, that the words used are to be regarded as the words of the grantor rather than of the grantee. Applying this rule, an exception or reservation in a conveyance is construed in favor of the grantee rather than of the grantor.' *Pure Oil Co. v. Kindall* (1927), 116 Ohio St. 188, 203 [156 N.E. 119], quoting 2 Tiffany, Real Property (2 Ed.Rev.1920), Section 437." *Campbell v. Johnson* (1993), 87 Ohio App.3d 543, 547, 622 N.E.2d 717.

{¶ 76} When reading this deed as a whole, given the vast rights the deeds grant to the coal estate, we find that the reservation was truly intended to be a reservation and not an exception. Yet, even if we are incorrect, as stated above, the general rule is that the conveyance should be construed in favor of the grantee—the coal estate.

{¶ 77} The Datkuliaks, in attempting to further distinguish the case at hand from the *Capstone* case, direct this court to an 1893 case from Pennsylvania that they assert is more analogous to the matter at hand than the *Capstone* case, *Chartiers Block Coal Co. v. Mellon* (1893), 152 Pa. 286, 25 A. 597.

{¶ 78} In *Chartiers,* like the case at hand, there is an owner of the surface estate and a separate owner of the coal estate. The surface-estate owner at the time of the conveyance of the coal estate did not reserve to himself the right or privilege to go through the coal to get to the gas and oil or any other substance that he still obtained. The Supreme Court of Pennsylvania stated that at the time the conveyance was made, neither the grantee nor the grantor was aware that under the coal lay a substance of perhaps greater value than the coal. The owner of the surface estate then leased the oil-and-gas estate out, and drilling occurred through the coal estate. The coal estate sought to prevent the gas and oil lessees from drilling. The trial court would not award an injunction as to any gas or oil wells already drilled; however, it did order an injunction on the drilling of any new gas or oil wells.

{¶ 79} The Supreme Court of Pennsylvania reviewed that ruling and upheld it. In doing so, it discussed the right of the coal owner to remove the coal and it also discussed the right of the surface owner to get to the layers of the strata it had not sold, i.e., the gas and oil layer. It also stated:

{¶ 80} "When the coal is all removed, the estate ends, for the plain reason that the subject of it has been carried away. The space it occupied reverts to the grantor by operation of law. It needs no reservation in the deed, because it was never granted. The grantee has the right to use and occupy it while engaged in the removal of the coal, for the reason that such use is essential to the enjoyment of the grant. It cannot be seriously contended that, after the coal is removed, the owner of the surface may not utilize the space it had occupied for his own purposes, either for shafts or well, to reach the underlying strata. The most that can be claimed is that, pending the removal, his right to access to the lower strata is suspended. * * * The right may be suspended during the operation of the removal of the coal to the extent of preventing any wanton interference with the coal mining, and for every necessary interference with it the surface owner must respond in damages. The owner of the coal must so enjoy his own rights as not to interfere with the lawful exercise of the rights of others who may own the estate, either above or below him. The right of the surface owner to reach his estate below the coal exists at all times. The exercise of it may be more difficult at some times than at others, and attended with both trouble and expense. No one will deny the title of the surface owner to all that lies beneath the strata which he has sold. It is as much a part of his estate as the surface. If he is denied the means to access to it, he is literally deprived of an estate which he has never parted with." Id.

{¶ 81} As this excerpt shows, the Pennsylvania Supreme Court was explaining that the surface owner still owned all his rights that he had not sold, but he could not interfere with the coal mining. The right to acquire oil and gas could be suspended during the mining of coal. It appears that the court was even stating that if the surface estate interfered in the mining of coal, the coal estate was entitled to damages.

{¶ 82} When reading the case in its entirety, it seems the court was trying to give a balance between the coal estate and the oil-and-gas estate. The court at length discussed our society's need for coal, oil, gas, and other minerals found in the earth's stratus. It concluded the opinion by stating:

{¶ 83} "It is not to be treated as a mere contest between A. and B. over a little corner of earth. We have already seen that, when the owner of the surface parted with the underlying coal, he parted with nothing but the coal. He gave no title to any of the strata underlying it, and it is not to be supposed for a moment that the grantor parted with or intended to part with his right to access to it.

We are of the opinion that he has such right of access. The only question is how that right shall be exercised, by what authority, and under what limitations." Id. at 298, 25 A. 597.

{¶ 84} The court then explained that those limitations should be made by the legislature, not the court of equity. However, it did uphold the trial court's grant of injunction for the drilling of future wells but allowed the remaining well to stand.

{¶ 85} As the above shows, this case makes statements that lend support for both sides. However, we do not find that its language sways our above conclusion that given the use of the word "reserving" and the vast entitlements that the deed does allow to the coal mining, it was the intention of the grantor and grantee that the coal estate was entitled to all the coal.

{¶ 86} Consequently, for the above stated reasons, we find no error with the trial court's declaration. This assignment of error lacks merit.

## SECOND ASSIGNMENT OF ERROR

{¶ 87} "The trial court erred to the prejudice of appellants by refusing to admit expert testimony."

{¶ 88} The Datkuliaks argue that the trial court erred in excluding their expert witnesses from fully testifying. Despite the fact that the Datkuliaks agreed that the language of the deed was unambiguous, in essence they attempted to have experts testify as to what the language in the deeds meant.

{¶ 89} It is within the sound discretion of a trial court to refuse to admit the testimony of an expert witness if such testimony is not essential to the trier of fact's understanding of the issue and the trier of fact is capable of coming to a correct conclusion without it. *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 148, 524 N.E.2d 881.

{¶ 90} Pursuant to Evid.R. 702, expert-opinion testimony is proper only if it would "assist the trier of fact to understand the evidence or to determine a fact in issue." The Tenth Appellate District has recently explained the purpose of expert-witness testimony. *Waste Mgt. of Ohio v. Cincinnati Bd. of Health*, 159 Ohio App.3d 806, 2005-Ohio-1153, 825 N.E.2d 660.

{¶ 91} "The purpose of expert testimony is to aid and assist the trier of fact in understanding the evidence presented and in arriving at a correct determination of the litigated issues. *McKay Machine Co. v. Rodman* (1967), 11 Ohio St.2d 77, 81–82 [40 O.O.2d 87, 228 N.E.2d 304]. However, 'an expert's interpretation of the law should not be permitted, as that is within the sole

province of the court.' *Wagenheim v. Alexander Grant & Co.* (1983), 19 Ohio App.3d 7, 19 [19 OBR 71, 482 N.E.2d 955]." Id. at ¶ 55.

{¶ 92} In *Waste Mgt. of Ohio,* one party attempted to have an expert testify as to whether Waste Management of Ohio substantially complied with Ohio's environmental laws. The appellate court concluded that this was a question of law and the expert testimony was properly excluded. Expert testimony is not admissible to assist the court in making its decision for issues that solely require a determination of a question of law and that raise no factual issue. *Sikorski v. Link Elec. & Safety Control Co.* (1997), 117 Ohio App.3d 822, 831, 691 N.E.2d 749 (determining that expert testimony as to whether a product's manufacturer has a duty to install its product is not admissible because it is a legal issue, not a factual issue; whether a duty is owed is a question of law); *State ex rel. Simmons v. Geauga Cty. Dept. of Emergency Serv.* (1998), 131 Ohio App.3d 482, 493, 722 N.E.2d 1063 (holding that the construction and interpretation of a statute involves a question of law, not a factual issue, and thus expert testimony is not admissible).

{¶ 93} Here, the issue involved interpretation of a deed that both parties admitted was clear and unambiguous. As aforementioned, the construction of deeds is a matter of law. *Long Beach Assn.* (1998), 82 Ohio St.3d at 576, 697 N.E.2d 208. The intent of parties to the deed resides within the language of the deed, and if the deed is unambiguous, no outside evidence is needed to show the intent of the parties. See *Parker,* 4th Dist. No. 99CA845, 2000 WL 1520046.

{¶ 94} Thus, considering the rule regarding expert testimony as to the pure legal questions and the fact that the admission of expert testimony is within the trial court's discretion, we cannot find that the trial court committed reversible error in excluding the testimony. Consequently, this assignment of error has no merit.

## THIRD ASSIGNMENT OF ERROR

{¶ 95} "The trial court erred in that its declaration ordering the appellants to plug and cap their gas well, without compensation of any kind, constitutes an unconstitutional taking of property without due process, in violation of the Ohio and United States constitutions."

{¶ 96} In this assignment of error, the Datkuliaks argue that the trial court's decision constituted an unconstitutional taking for which compensation must be given. The Datkuliaks assert that the common pleas court is the governmental actor in this case.

{¶ 97} AEC argues that this argument cannot be made for the first time on appeal. Additionally, they argue that the common pleas court is not a governmental actor for purposes of eminent domain.

{¶ 98} To begin with, we acknowledge that this taking argument is made for the first time on appeal. However, it could not have been made to the trial court because the alleged taking did not occur until the common pleas court issued its ruling. Therefore, we will address the argument.

{¶ 99} Both Section 19, Article I of the Ohio Constitution and the Fourteenth and Fifteenth Amendments of the United States Constitution prohibit the government from taking private property for public use without just compensation. *Palazzolo v. Rhode Island* (2001), 533 U.S. 606, 617, 121 S.Ct. 2448, 150 L.Ed.2d 592; *State ex rel. R.T.G., Inc. v. Ohio,* 98 Ohio St.3d 1, 2002-Ohio-6716, 780 N.E.2d 998, ¶ 33. Takings usually occur "when the government encroaches upon or occupies private land for its own proposed use." *Palazzolo,* 533 U.S. at 617, 121 S.Ct. 2448, 150 L.Ed.2d 592. However, a taking may also occur by government regulation of property. *State v. Tri–State Group, Inc.,* 7th Dist. No. 03BE61, 2004-Ohio-4441, 2004 WL 1882567, ¶ 47.

{¶ 100} In *Tri–State,* we explained that in some instances a trial court's permanent injunction may constitute a taking.

{¶ 101} "The only difference between the alleged taking in this case and any other regulatory taking is that the taking was the result of an order imposed by a trial court using its discretion to fashion a permanent injunction. If the OEPA or a local zoning board ordered the same kind of land use restriction, Appellants could use mandamus to obtain relief. The mere fact that the trial court ordered the land use restriction in this case makes the underlying claim no different." Id.

{¶ 102} Thus, a trial court's decision, in some instances, can constitute a taking. However, given the facts in the case at hand, it cannot be said that the trial court's decision constituted a taking.

{¶ 103} The trial court, in this instance, was not issuing a permanent injunction that restricted the use of the land, that is, it was not acting in a regulatory capacity. Rather, the trial court was interpreting deeds. Both parties admit that their respective rights are governed by the language of the deed. The trial court ruled that the language of the deed entitled the coal-estate owner, AEC, to all the coal without interference from the Datkuliaks' well. Its decision was based on the language of the deed; it was deciding legal rights based on the deed. Even if the determination was incorrect, the decision does not constitute a taking; rather, it would just be an error of law.

{¶ 104} For all the above reasons, this assignment of error is deemed meritless. There is no taking here because the common pleas court, in deciding a case, is not taking governmental action.

## CONCLUSION

{¶ 105} For the foregoing reasons, this appeal is moot. However, even if we address the merits of the appeal, we find no error with the trial court's decision.

Appeal dismissed.

DeGenaro, P.J., and Donofrio, J., concur.