

FILED

Jan 09 2020, 7:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Mark J. Crandley
Lester Parvin Price
Barnes & Thornburg LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory A. Neibarger
Margaret M. Christensen
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

David T. McGimpsey
Bingham Greenebaum Doll LLP
Jasper, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| MGPI of Indiana, LLC, <br> *Appellant-Plaintiff,* <br><br> v. <br><br> South Dearborn Regional Sewer District, <br> *Appellee-Defendant.* | January 9, 2020 <br><br> Court of Appeals Case No. 19A-PL-393 <br><br> Appeal from the Dearborn Circuit Court <br><br> The Honorable James D. Humphrey, Judge <br><br> Trial Court Cause No. 15C01-1805-PL-44 |

**Kirsch, Judge.**

[1] MGPI of Indiana, LLC ("MGPI") challenged a rate setting ordinance ("the Ordinance") adopted by the South Dearborn Regional Sewer District ("the District") and upheld by the District Authority of Dearborn County ("The

District Authority"). The Dearborn Circuit Court issued an order upholding the District Authority's ruling.

[2] On appeal, MGPI raises four issues, which we restate as:

I. Whether approval of the Ordinance by the Indiana Department of Environmental Management ("IDEM") was required;

II. Whether the District failed to consider MGPI's interests when it enacted the Ordinance;

III. Whether the Ordinance violated MGPI's vested interest; and

IV. Whether the Ordinance is arbitrary and capricious.

[3] We affirm.[1]

## Facts and Procedural History

### *The South Dearborn Regional Sewer District is Created*

[4] In 1971, the Board of Trustees of the District filed a plan of operation with the Dearborn Circuit Court for a proposed regional sewer district. Following a hearing, the court issued an order ("the 1972 order") and found "that the proposed District is necessary, and that it and the plan of operation of the

---

[1] Oral argument was heard on this case on December 3, 2019 in the Indiana Court of Appeals courtroom in Indianapolis, Indiana. We commend counsel on the quality of their written and oral advocacy.

District is conducive to the public health, safety, convenience and welfare, and that the plan for the operation of the District is economical, feasible, fair and reasonable." *Appellant's App. Vol. II* at 33. The court also found that "the only users of the sewage system of said District having an intermittent flow of at least one million (1,000,000) gallons per day are the Joseph E. Seagram & Sons, Inc. plant [("Seagram")] and the Schenley Distillers, Inc. plant [("Schenley")]." *Id*. The court accepted the proposed plan and created the District as a political subdivision for the area within the boundaries of the City of Lawrenceburg ("Lawrenceburg"), the Town of Greendale ("Greendale"), and the City of Aurora ("Aurora"). Both Seagram and Schenley had an intermittent daily sewage flow of at least one million gallons, and each was designated as a member of the District. The District was to be governed by a board of trustees consisting of, among others, 1) the mayors of Aurora, Greendale, and Lawrenceburg, and 2) a representative from Seagram and a representative from Schenley. The court stated that each trustee "shall hold office so long as he meets the criteria or until the qualification of his successor." *Id*.

### *The 1972 Contract Creates Vested Interest for Seagram*

[5]     In May of 1972, Seagram, Schenley, and the other members of the District signed a contract that described how the District would operate ("the 1972 Contract"). The 1972 Contract required Seagram to pay "an amount equal to

22.8% of the fixed operations and maintenance costs plus such proportional amount of the variable operational costs as the metered influent from Seagram bears to the total influent, and also such charges as may be assigned for the maintenance of Industrial Interceptors Nos. 1 and 2." *Id*. at 73. The 1972 Contract also gave Seagram a vested interest in the District's design capacity: "Seagram . . . *shall have a vested interest in the respective allocation of design capacity* as set forth in Item 9.2 of this agreement *of which it may not be divested of said interest without its consent*." *Id*. at 78 (emphasis added). Item 9.2 of the 1972 Contract set Seagram's design capacity at 22.8%. *Id*. at 72.

### Subsequent Sales of the Distillery

[6] Pernod Ricard USA ("Pernod") bought Seagram's interest in the distillery, and in October of 2002, Pernod entered a contract with the other members of the District ("the 2002 Contract"). The 2002 Contract continued the right to a vested interest, stating that Pernod "shall have a vested interest in the respective allocation of design capacity as set forth in section 2.2 of this contract and may not be divested of said interest without its consent." *Id*. at 99. Section 2.2 of the 2002 Contract stated that Pernod's portion of the vested interest was 28%. *Id*. The 2002 Contract also gave Pernod the right to assign its rights to a purchaser of the distillery: "If Pernod sells its Lawrenceburg plant, Pernod may assign its interest in this contract to the purchaser in which event the purchaser shall be substituted for Pernod as a party to this contract and Pernod shall be released and discharged from its obligations hereunder." *Id*. at 110. After it bought the distillery, Pernod signed a new contract with the District in which

Pernod disclaimed its vested ownership interest in the distillery and became a retail customer of the District's sewer services. *Appellant's App. Vol. III* at 68.

[7] In June of 2007, Pernod sold the distillery to Lawrenceburg Distillers Indiana, LLC ("LDI") by special warranty deed. The sale to LDI was subject to the 2002 Contract. Exhibit C listed "Recorded Exceptions – Dearborn County." *Id*. at 126. The final exception referred to the 2002 Contract: "Contract between the City of Lawrenceburg, the City of Aurora, the City of Greendale, [Pernod], and [the District], recorded December 22, 2002 in Official Record Book 56, Page 1392 of the Dearborn County, Indiana." *Id*. at 127.

### LDI Sells Distillery to MGPI

[8] On December 21, 2011, LDI sold the distillery to MGPI by special warranty deed. *Appellant's App. Vol. II* at 147. The deed made the transaction subject to the 2002 Contract. *Id*. at 157.

[9] Bill Neyer ("Neyer"), the plant manager for the District's sewer facility, testified:

> During the change of ownership between the predecessor of LDI to MGPI, there were several changes. Instead of being an owner which had a shared interest in all capital projects, they became a retail customer. They also gave up their seat on the board, as well, as part of that change. So, they no longer had a voting interest, they no longer had capital responsibility and they paid up on all the outstanding debt that they had. So, that was a pretty significant change to the way operations occurred.

*Appellant's App. Vol. III* at 68.

[10]     Neyer also testified that, at some point after MGPI bought the distillery, it gave up all ownership interest in the distillery:

> So initially the District had, as has been stated, five members. When Schenley ceased to operate, they ceded their ownership to the District. There was no compensation provided to them for that ownership. It became jointly owned by the remaining four members. There was a disbursement of that membership of percentages, and then later the distillery, MGPI, not at that time, it was very early when they took ownership, they did not want to own a wastewater plant or have part ownership and liability for it, so they fulfilled all their obligations to the facility for any debt that they were a party to and ceded their ownership, which was then uniformly split between the remaining three members.

*Id.* at 58. Neyer then testified that, after MGPI surrendered its ownership interest in the District, it signed a contract with the District in 2011, which expired at some point in 2013. *Id.* at 58-59.

[11]     On September 18, 2017, the District's attorney sent a letter to Ken Carrier of MGPI, stating that MGPI had surrendered its ownership interest in the District: "*Just as MGPI at one time decided it no longer wanted to be a co-owner* of [the District], so the [District] Board has decided that they would no longer have any "customers" other than [Lawrenceburg, Greendale, and Aurora]." *Id.* at 147 (emphasis added). The District agreed to extend the current sewage rates until a cost of service study of the District was completed. *Id.* at 147-48.

## *Cost of Service Study*

[12] The District hired Crowe Horwath LLP ("Crowe") to conduct a cost of service study ("the Cost of Service Study"); Crowe began the study in February of 2016 and completed it in October of 2017. *Id*. at 155.

> The purpose of this [Cost of Service Study] is to estimate the [District's] cash flow and financial capacity to meet its on-going revenue requirements for operation and maintenance expenses and to make capital improvements to the [District's] system. In addition, this [Cost of Service Study] also identifies the costs associated with serving various customers of the [District].

*Id*. at 167. During the study, Crowe participated in several meetings with the District's Board of Directors, and representatives of MGPI attended many of those meetings. *Id*. at 155.

[13] After Crowe completed the Cost of Service Study, the attorney for the District wrote the aforementioned September 18, 2017 letter to MGPI, stating that the District could no longer afford to negotiate directly with MGPI to establish MGPI's sewer rates and that MGPI would now be a customer of Lawrenceburg and have to negotiate its rights with Lawrenceburg, which would, in turn, negotiate its rates with the District:

> At the time the March letter was sent, the [District] Board did believe we would be entering into a new agreement with MGPI; however, as information from the Cost of Service (COS) study being conducted by Crowe Horwath LLP (Crowe) started to become available to the [District] Board, it became evident that keeping MGPI as a customer was not economically feasible to [the District]. As such, discussions at our monthly meetings

ultimately shifted to having MGPI become a customer of either the City of Greendale or the City of Lawrenceburg. Representatives from MGPI were present at all of these meetings and were well aware that the [District] Board was looking to move in a different direction. Just as MGPI at one time decided it no longer wanted to be a co-owner of [the District], the [District] Board has decided that they would no longer have any customers other than the three (3) cities.

. . . .

Extending your current rates until the [Cost of Service Study] is completed was a courtesy that [the District] extended to MGPI because of the long relationship that we shared. However, as there is no agreement in place, we are under no obligation to continue servicing MGPI as a customer and can turn MGPI over to Lawrenceburg at any time. We have chosen not to do that because, the [District] Board believes, the completion of the [Cost of Service Study] must occur before any drastic changes are made.

[The District] is happy to continue to service MGPI until such time, but MGPI will ultimately become a customer of the City of Lawrenceburg as the [District] Board has no desire to continue servicing MGPI as a customer of [the District] once the [Cost of Service Study] has been completed.

The [District] Board came to this conclusion after many months of discussions. I cannot stress enough that representatives from MGPI were present at all of these meetings and the ultimate decision of the [District] Board should not be a surprise.

*Id.* at 147-48.

## *The District Board Enacts the Ordinance*

[14]     Based on the information gained from the Cost of Service Study, on February 13, 2018, the District Board enacted an Ordinance that set new sewage rates for Lawrenceburg, Greendale, and Aurora. It did not set rates for MGPI or recognize MGPI as a direct customer of the District.

[15]     The Ordinance provided:

> WHEREAS, pursuant to Indiana Code § 13-26-5-2(7), the [South Dearborn Regional Sewer District] may "[f]ix, alter, charge, and collect reasonable rates and other charges in the area served by the [D]istrict's facilities to every person whose premises are, whether directly or indirectly, supplied with water or provided with sewage or solid waste services by the facilities . . .";

> WHEREAS, Indiana Code § 13-26-11-8 requires that the boards of regional water sewage, and solid waste districts establish, by ordinance, "just and equitable rates or charges for the use of and the service provided by a works";

> WHEREAS, the current amounts paid by the Cities of Aurora, Greendale, and Lawrenceburg were established by a Sewer User Agreement dated August 8, 2007 and which was effective as of July 1, 2007;

> WHEREAS, the South Dearborn Regional Sewer District believes it to be in the best interests of the South Dearborn Regional Sewer District and the Cities of Aurora, Greendale, and Lawrenceburg to establish nondiscriminatory, just, and equitable sewage treatment rates rather than continuing to use the billing structure established by the Sewer User Agreement;

WHEREAS, in an effort to establish nondiscriminatory, just, and equitable sewage treatment rates, the South Dearborn Regional Sewer District engaged the services of Crowe Horwath LLP on February 9, 2016 to perform a Rate Review and a Cost of Service Study which would allow the South Dearborn Regional Sewer District to establish sewage treatment rates;

WHEREAS, the Crowe Horwath LLP Rate Review and Cost of Service Study was completed on October 27, 2017 and it recommends that the sewage treatment rates for South Dearborn Regional Sewer District customers be established as follows:

. . . .

1. Pursuant to the authority granted by Indiana Code § 13-25-5-2(7) and the procedure outlined in Indiana Code § 13-26-11 *et seq.,* the South Dearborn Regional Sewer District may establish sewage treatment rates that are nondiscriminatory, just, and equitable.

2. The recommendations of the Crowe Horwath LLP Rate Review and Cost of Service Study are hereby approved and accepted. Pursuant to said Cost of Service Study, the sewage treatment rates shall be established as follows:

. . . .

5. The South Dearborn Regional Sewer District finds that the requirements for the adoption of initial rates as found in Indiana Code § 13-20-11 *et seq.*, most notably the notice requirement found in Indiana Code § 13-26-11-12 and the Public Hearing requirement found in Indiana Code § 13-26-11-11, were adhered to prior to the adoption of this Ordinance.

6. Additionally, the South Dearborn Regional Sewer District finds that the factors outlined in Indiana Code § 13-26-11-2(a) have been considered before the passage of this Ordinance and that the rates established by this Ordinance are nondiscriminatory, just, and equitable pursuant to Indiana Code § 13-26-11-9.

7. The sewage treatment rates as established by this Ordinance shall not take effect until the 1st day of January 2019, unless an earlier date is agreed to by the Cities of Aurora, Greendale, and Lawrenceburg by amendment to this Ordinance.

*Id.* at 18-23. The District did not seek approval of the Ordinance from IDEM.

### *MGPI Appeals Ordinance to the District Authority*

On March 13, 2018, MGPI appealed the Ordinance to the District Authority.

*Id.* at 7-10. In its petition, MGPI alleged the following:

9. The rates and charges established by the Ordinance are not just and equitable in at least the following respects:

a. The rate applied in the Ordinance to treat biochemical oxygen demand (BOD), including total suspended solids, results in over charging by approximately $600,000 above the revenue requirement established by the rate study and allocated through the cost of service on which the Ordinance claims to be based;

b. The Ordinance unfairly allocates the costs for phosphorus removal to [MGPI];

c. The methodology upon which the Ordinance is written arbitrarily departs from the traditional method that uses a base concentration of BOD and a base concentration of total

suspended solids representative of domestic sewage, above which a surcharge is applied;

d. The Ordinance provides for pH testing which does not follow [Environmental Protection Agency ("EPA")] protocols; and

e. The Ordinance will result in an increase to [MGPI's] user fees substantially higher than the 16.06% reduction for the City of Aurora, the 32.66% increase for the City of Greendale, and the 24.4% increase for the City of Lawrenceburg.

10. The Ordinance inappropriately eliminates [MGPI] as a customer of the [District], eliminates [MGPI's] use of previously vested capacity, and constitutes an unlawful taking of [MGPI's] property without due process.

11. The District Authority should find that the rates and charges as set forth in the Ordinance are not just and equitable.

12. The District Authority should declare that [the District] should continue to serve [MGPI] directly as a ratepayer.

13. The District Authority should declare the Ordinance null and void as it relates to [MGPI], and, if appropriate, recommend that [the District]'s representatives and [MGPI]'s representatives meet to resolve allocations and service issues.

*Id.* at 8-10.

[17] At the April 4, 2018 hearing before the District Authority, John Skomp ("Skomp"), the District's expert, confirmed that the Cost of Service Study -- and therefore the Ordinance -- did not consider MGPI. *Id.* at 44. He confirmed that

the rates under the Ordinance "are not going to be applied to MGPI. They weren't intended to." *Id.* Because of the Ordinance, Skomp stated that the District now has only "three wholesale customers. That's all they have is just the three customers," the three municipalities. *Id.* at 41. He admitted that the Cost of Service Study did not consider service to MGPI: "If we were to have assumed that MGPI was gonna be a customer of the District, we would have done the [C]ost of [S]ervice [S]tudy differently because we would have had then one retail customer and three wholesale customers." *Id.* at 45.

[18] Skomp also testified that it was not possible, based on the rate study, to determine what MGPI would be paying for services as a customer of Lawrenceburg:

> The rate study was not developed in such a way that these rates could be applied to them. So, when they take the rates from the study and say this is what our bill would be, that's inaccurate. . . . You cannot take this rate study, or even the results of Mr. Roper's letter, and say that based upon this or that, this is what MGPI will be paying. They will be paying rates based upon the rates that are passed by the City of Lawrenceburg. We're currently working with the City of Lawrenceburg to develop rates, charges, and doing a rate study there. It's not complete. I don't even have preliminary results at this point in time, but that's who will be billing MGPI for their service. So, as you look this not only goes to the concerns of the petition, but also Mr. Roper's letter here. They try to take the rates from this study or the rates that Mr. Roper analyzed and say this is what MGPI's bill will be, and that's just not correct.

*Id.* at 44-45.

[19]     At that same hearing, MGPI presented the sworn statement of Ralph Roper ("Roper"). *Id.* at 223. Roper identified alleged deficiencies in the Ordinance, including that it would: 1) result in overcollection of revenue by the District by about a half million dollars because the Ordinance took a rate from one category of discharge and applied it to a different category without any analysis for the switch; 2) charge for the removal of phosphorus when MGPI's discharges do not add phosphorus to the District's system; 3) apply a short-cut protocol for testing the pH of wastewater instead of a required procedure promulgated by the EPA; and 4) charge MGPI for nearly forty percent of the District's revenue even though MGPI discharges only about twenty-nine percent of the total wastewater in the system. *Id.* at 223, 225-26, 230.

[20]     After considering argument and evidence from both sides, the District Authority upheld the Ordinance, finding that the Ordinance was enacted pursuant to the proper procedure and that the rates were just and equitable ("the District Authority Order"). *Id.* at 81-82. In pertinent part, the District Authority stated:

> No issues were raised by [MGPI] in regards to the procedure followed by [the District] and all evidence presented indicates that the [District] did follow the proper procedure for the adoption of the Ordinance; therefore, the District Authority makes the determination, pursuant to Indiana Code § 13-26-11-13(f)(1) that the [District] did follow the procedure required by Indiana Code § 13-26-11 *et seq.* when it adopted Ordinance 2018-01; and

As noted in Indiana Code § 13-26-11-9(b), ". . . initial rates and charges established after notice and hearing under this article are prima facie just and equitable." [MGPI] had the burden of showing that the rates and charges were not just and equitable but failed to do so. Therefore, the District Authority makes the determination, pursuant to Indiana Code § 13-26-11-13(f)(2) that the sewer rates and charges established by the [District] Ordinance 2018-01 are just and equitable rates and charges, according to the standards set forth in Indiana Code § 13-26-11-9.

Based upon the foregoing, the District Authority, that being the Dearborn County Board of Commissioners, does hereby SUSTAIN THE ORDINANCE ESTABLISHING THE RATES AND CHARGES as written pursuant to Indiana Code § 13-26-11-13(g)(1).

*Id.*

[21] On May 16, 2018, MGPI appealed the District Authority Order to the Dearborn Circuit Court, alleging, in part, that the Ordinance: 1) would result in excessive revenue for the District; 2) unfairly allocated cost of phosphorous removal to MGPI; 3) failed to follow protocols issued by the EPA for measuring pH levels; and 4) would increase MGPI's user fees. *Appellant's App. Vol. II* at 25-26. Thus, MGPI requested both preliminary and permanent injunctions and, in the alternative, filed a complaint ("alternative complaint") for 1) taking a vested capacity, 2) breach of contract, 3) breach of fiduciary duty, and 4) unjust enrichment. *Id.* at 26-31. On October 31, 2018, the District filed a motion for summary judgment but only on allegations in the alternative complaint. *Id.* at 6.

On December 6, 2018, the trial court conducted a hearing on MGPI's appeal from the District Authority, and on December 27, 2018, it denied MGPI's appeal and upheld the Ordinance. *Id.* at 11-13. The trial court ruled, in part:

> 3. MGPI failed to meet its burden of proof to establish that the District's passing of the Ordinance, and the subsequent affirmation by the District Authority, were arbitrary, capricious, an abuse of discretion, unsupported by the evidence, or in excess of statutory authority.
>
> 4. While not required to do so and irrespective of any deference to the District Authority, the Court concludes based on its independent evaluation of the evidence that the Ordinance, and the subsequent affirmation by the District Authority, were not arbitrary, capricious, an abuse of discretion, unsupported by the evidence, or in excess of statutory authority.
>
> . . . .
>
> 6. The District presented substantial evidence that the Ordinance complied with the requirements of Indiana Code § 13-26-11-9(a).
>
> 7. Irrespective of any deference to the District Authority, the board of trustees of the District, in adopting the Ordinance establishing sewer rates and charges, followed the procedure required by I.C. § 13-26-11-1 *et seq*.
>
> 8. Irrespective of any deference to the District Authority, the sewer rates and charges established by the board of trustees of the District by the Ordinance are just and equitable rates and charges, according to the standards set forth in I.C. § 13-26-11-9.

*Id*. at 11-12.

On January 9, 2019, MGPI asked the trial court to enter final judgment on its ruling, pursuant to Trial Rule 54(B), and to stay all proceedings. *Id.* at 8. On February 11, 2019, the trial court granted the request, determining "that there is no just reason for delay and directs entry of judgment in [the District's] favor on Count I of [MGPI's] complaint." *Id.* at 14. The trial court also granted MGPI's motion for stay, although the trial court did not stay the pending hearing on the District's motion for summary judgment: "Other than the pending summary judgment hearing, the Court hereby ORDERS that all other proceedings before this Court shall be stayed pending remand of the matter from the appellate courts." *Id.* On March 27, 2019, the trial court conducted a hearing on the District's motion for summary judgment and asked the parties to file proposed orders by April 10, 2019. *Id.* at 10. This court acquired jurisdiction over this matter on April 4, 2019. *See* Ind. Appellate Rule 8. We will provide additional facts as necessary.

# Discussion and Decision

[24] A district authority reviews an ordinance as follows:

> (g) After the district authority hears the evidence produced and makes the determinations set forth in subsection (f), the district authority, by a majority vote, shall:
>
> (1) sustain the ordinance establishing the rates and charges;
>
> (2) sustain the petition; or

(3) make any other ruling appropriate in the matter, subject to the standards set forth in section 9 of this chapter.

Ind. Code § 13-26-11-13(g). A district authority's ruling may be appealed to the circuit, superior, or probate court, and that court shall determine one or both of the following: 1) whether the district's board of trustees followed the proper procedures in adopting the ordinance; and 2) whether the sewer rates and charges are equitable. Ind. Code § 13-26-11-13(h).

[25] Just and equitable rates are those that: 1) produce sufficient revenue to pay all expenses incident to the operation of the works; 2) produce sufficient revenue to provide the sinking fund for the liquidation of bonds or other evidence of indebtedness; 3) produce sufficient revenue to provide adequate money to be used as working capital, as well as money for making improvements; and 4) "*give due consideration to the interests of the ratepayers*." Ind. Code § 13-26-11-9(a) (emphasis added). "Rates and charges too low to meet the financial requirements described in subsection (a) are unlawful. The initial rates and charges established after notice and hearing under this article *are prima facie just and equitable*." Ind. Code § 13-26-11-9(b) (emphasis added).

> The standard for judicial review of the District's action is whether it was arbitrary, capricious, or contrary to law. . . . Under this narrow standard of review, we will not intervene in a local legislative process, [if it is] supported by some rational basis. We will find a municipal entity's action arbitrary or capricious only if it is patently unreasonable. In short, judicial review of whether a governmental agency has abused its rulemaking authority is highly deferential. We are not permitted to substitute

our judgment for the municipality's discretionary authority. Rather, we may only determine whether the municipality is acting within its statutory authority.

*Yankee Park Homeowners Ass'n, Inc. v. LaGrange Cty. Sewer Dist.*, 891 N.E.2d 128, 130-31 (Ind. Ct. App. 2008) (internal quotations and citations omitted), *trans. denied*.

## I.   Was IDEM'S Approval of the Ordinance Required?

[26]   MGPI argues that the Ordinance is void as a matter of law because the Ordinance changed the "purpose" of the District's plan, and, therefore, approval of the Ordinance by IDEM was required.  Indiana Code section 13-26-1-2 describes the process of seeking permission from IDEM to change a district plan and IDEM's authority regarding such requests:

> (a) At any time after the creation of a district, the district, after motion by the district's board, may file a petition with the department requesting the approval of the department permitting the district to:

> (1) *increase or add to the district's purposes or modify the district plan approved by the department*;

> (2) abandon or surrender all or part of a purpose or plan approved by the department; or

> (3) subject to IC 13-26-4-1, increase the number of persons serving on the board of trustees.

> (b) The department may:

(1) approve;

(2) modify and approve; or

(3) reject;

a request received under this section.

Ind. Code § 13-26-1-2 (emphasis added). *See Fox v. Green*, 856 N.E.2d 86, 88 n.1 (Ind. Ct. App. 2006) ("IC 13-26-1-2 contemplates approval by IDEM for any modifications to its plan and IC 13-26-5-2, which sets forth the powers of a regional wastewater district, does not appear to grant a district the power to unilaterally make changes to its plan without IDEM approval."); *see also Clay Twp. of Hamilton Cty. ex rel. Hagan v. Clay Twp. Reg'l Waste Dist.*, 838 N.E.2d 1054, 1066-67 (Ind. Ct. App. 2005) (final authority for appointment of additional trustees to regional waste district board rests with IDEM).

[27]    As to what constitutes a district's "purpose," Indiana Code section 13-26-1-1 provides:

> Any area may be established as a regional water, sewage, or solid waste district under this article for one (1) or more of the following purposes:
>
> (1) To provide a water supply for domestic, industrial, and public use to users inside and outside the district.
>
> (2) To provide for the collection, treatment, and disposal of sewage inside and outside the district.

(3) To provide for the collection, treatment, and disposal of solid waste and refuse inside and outside the district.

*Id*.[2]

[28]     MGPI argues that the Ordinance changed the purpose of the plan because it eliminated MGPI as a direct user and that this violates one of the purposes of the 1972 Order -- to give direct sewer services to users whose daily intermittent flow exceeded one million gallons per day, which at the time described MPGI's predecessor in interest, Seagram.  In support, MGPI points to the following language in the 1972 Order:

> IT IS FURTHER FOUND that the only users of the sewage system of said district having an *intermittent flow of at least one million (1,000,000) gallons per day are the Joseph E. Seagram & Sons, Inc., plant* and the Schenley Distilleries, Inc., plant.
>
> . . . .
>
> 2. That the Board of Trustees shall be composed of . . . *a member designated by each user of the sewage treatment facilities of said district which said user(s) has an intermittent flow of at least one million (1,000,000) gallons per day or more into the sewage system.*

---

[2] Although enacted in 1996, this statute applies to any district established by "an order of the court before February 17, 1972." Ind. Code § 13-26-3-1.  The District was established by court order on January 26, 1972. *Appellant's App. Vol. III* at 86.

> 3. That each of said Trustees shall hold office so long as he meets the criteria or the qualification of his successor.

*Appellant's App. Vol. II* at 33 (emphasis added). MGPI thus argues that because the Ordinance eliminated MGPI as a direct user of the District, the Ordinance changed the purpose of the plan because the Ordinance no longer guarantees direct service to a user with an intermittent daily flow of at least one million gallons.

[29] In response, the District argues that it was unnecessary to obtain IDEM's permission to enact the Ordinance because the Ordinance did not change or modify the plan or the purpose of the plan. The District argues that the Ordinance did not change the purpose of the plan because the purpose of the plan, as explained in the 1972 Order, was to provide sewage and wastewater services, nothing more, and under the Ordinance, the District is still providing services for sewage and wastewater treatment. The District relies on Indiana Code section 13-26-1-1, which defines the purpose of a regional sewage district, in part, as "[t]o provide for the collection, treatment, and disposal of sewage inside and outside the district." *Id*.

[30] We agree with the District. The Ordinance did not change the District's plan because under the Ordinance, the District still provides sewage and wastewater treatment services. *See Appellant's App. Vol. III* at 18-23. MGPI does not dispute this. The Ordinance does not repudiate any of the terms of the 1972 Order as to the delivery of sewage and wastewater treatment. *See Appellant's App. Vol. II* at

33. Therefore, the District was not required under Indiana Code section 13-26-1-2 to obtain permission from IDEM to enact the Ordinance.

## II.    Did the District Fail to Consider MGPI's Interests?

[31]    MGPI argues that the District failed to consider MGPI's interests as a rate payer when it adopted the Ordinance and, thus, did not set just and equitable rates. *See* Ind. Code § 13-26-11-9(b); Ind. Code § 13-26-11-13(f).

[32]    Just and equitable rates are rates that:

> (1) produce sufficient revenue to pay all expenses incident to the operation of the works, including maintenance cost, operating charges, upkeep, repairs, and interest charges on bonds or other obligations;
>
> (2) produce sufficient revenue to provide the sinking fund for the liquidation of bonds or other evidence of indebtedness and reserves against default in the payment of interest and principal of bonds;
>
> (3) produce sufficient revenue to provide adequate money to be used as working capital, as well as money for making improvements, additions, extensions, and replacements; and
>
> (4) *give due consideration to the interests of the ratepayers.*
>
> (b) Rates and charges too low to meet the financial requirements described in subsection (a) are unlawful. The initial rates and charges established after notice and hearing under this article are prima facie just and equitable.

(c) Nothing in this section shall prohibit a district authority from examining the methodology or process by which rates and charges were derived.

Ind. Code § 13-26-11-9 (emphasis added).

Regional districts "have broad discretion to enact ordinances establishing its rates and charges." *Taylor v. Fall Creek Reg'l Waste Dist.*, 700 N.E.2d 1179, 1184 (Ind. Ct. App. 1998), *trans. denied*. "Rates for sewage works may be determined by a combination [of the foregoing six factors] or other factors that the board determines is necessary to establish nondiscriminatory, just, and equitable rates or charges." Ind. Code § 13-26-11-2(a)(7).

[33] MGPI argues that the District did not consider MGPI's interests because the Ordinance does not mention MGPI or establish the rates that MGPI would incur now that it would need to negotiate its rates with Lawrenceburg. *Appellant's App. Vol. III* at 18-23. In support, MGPI refers to the testimony of Skomp, the District's expert witness, at the April 10, 2018 hearing before the District Authority. Skomp testified that the rates in the Ordinance would not apply to MGPI because the Ordinance was not intended to apply to MGPI:

> These rates are not going to be applied to MGPI. *They weren't intended to. The rate study was not developed in such a way that these rates could be applied to them*. So, when they take the rates from the study and say this is what our bill would be, that's inaccurate. The District came through, and as part of this study, and as part of their process of doing other things, there was a decision made that MGPI would become a customer of the City of Lawrenceburg. You cannot take this rate study, or even the

results of [Roper's] letter, and say that based upon this or that, this is what MGPI will be paying.

*Id.* at 44 (emphasis added).

[34] In response, the District appears to claim that because MGPI's contract with the District had expired in 2013 -- *see Appellant's App. Vol. III* at 58-59 -- MGPI was no longer a customer of the District, and the District was not required to consider MGPI's interests in establishing the Ordinance. *See Appellee's Br.* at 14. However, the District claims that it did consider MGPI's interests, even if it was not required to do so. The District cites Skomp's testimony that MGPI's representatives attended and were heard at meetings before the Ordinance was enacted: "MGPI was at most of those meetings that I attended, and meeting with them, and so the customers did hear what was going on, and due consideration was given to the things they were saying and what they needed." *Appellant's App. Vol. III* at 38, 155, 158.

[35] The District also quotes the following language from Skomp's Supplement to show that the District considered MGPI's interests:

> During this time, Crowe had numerous meetings with the Board (which consisted of owner-ratepayers) and elected officials or representatives of the ratepayers. At many of those meetings, policy discussions were conducted regarding how various changes in the rate structures would affect the customers' monthly bills. *Those discussions included how MGPI could be billed on a going-forward basis and the impact that would have on the monthly bills of whichever city may accept MGPI as a retail customer.*

> As discussions were on-going, changes were made and rates and charges were adjusted to give due consideration to the comments of the customers regarding how the proposals affected their various interests.

*Id.* at 158 (emphasis added).

[36] The District claims the Cost of Service Study took MGPI's interests into account in other ways: listing MGPI's accounts receivable to the District; noting the District's liability in the form of the payable amount of MGPI's depreciation fund; MGPI's operating income; the necessary adjustment to operating income to allow conversion of MGPI to a retail customer of Lawrenceburg, and the adjustment to Lawrenceburg's flow total once MGPI became a customer of Lawrenceburg. *Id*. at 169, 170, 175, 178, 179, 184.[3]

[37] We reject MGPI's claim that the District did not take MGPI's interests into account when enacting the Ordinance. The foregoing evidence proves otherwise. Of particular note are the following: (1) MGPI's presence at many meetings where the proposed Ordinance was discussed; (2) that "due consideration was given to the things [the customers] were saying"; and (3) that "discussions included how MGPI could be billed on a going-forward basis." *Id*. at 155, 158. Finally, the Skomp Supplement establishes, by implication, that

---

[3] The District argues that MGPI has waived its argument that the Ordinance did not consider MGPI's interests because the District claims MGPI did not raise this argument during the April 10, 2018 hearing before the District Authority. *See Appellant's App. Vol. III* at 24-80. We reject this argument based on the following parts of the record that establish that MGPI did, in fact, raise this issue: *Appellant's App. Vol. II* at 169-74; *Appellant's App. Vol. III* at 84-85.

the District did consider the possibility that the Ordinance would raise MGPI's rates. This is apparent from the statement in Skomp's Supplement that the District considered how the new method of billing MGPI would "impact . . . the monthly bills of which every city may accept MGPI as a retail customer." *Id.* at 158. A reasonable inference from this statement is that the District weighed the possibility that the Ordinance could increase the rates of both MGPI and the city that accepted MGPI as a retail customer and, nonetheless, chose to enact the Ordinance. Accordingly, we reject MGPI's claim that the District failed to consider MGPI's interests when it enacted the Ordinance.

## III.   Did the Ordinance Violate MGPI's Vested Interest?

[38]   MGPI argues that the Ordinance took away its vested interest in the District. MGPI contends that the vested interest in the District ran with the land, i.e., the distillery, and that with the successive sales of the distillery, that vested interest passed to successive purchasers and thus now vests in MGPI. It argues:

> *The vested capacity naturally ran with the land*, as no entity other than the owner of the distillery could exercise those rights. Through a number of transactions, the distillery and all rights associated with it passed from Pernod to LDI and finally to MGPI. Each transfer passed the entire distillery, the real property, and all of its associated rights to the next owner. That included the right to the vested capacity.

*Appellant's Br.* at 21 (emphasis added). MGPI reiterated this point in its reply brief:

Reading the deeds to pass the vested capacity comports with the context in which those transactions occurred. The vested capacity serves a core function for the distillery by providing ready access to wastewater service that the owner needs to brew spirits. That contractual right is only useful to the current owner of the distillery. *To ensure the distillery can continue to operate, the vested capacity naturally passed from owner to owner under the deeds. . . . .* Each transfer therefore passed the entire distillery, the real property, and all of its associated rights. That included the right to the vested capacity. *And the 2002 Contract was recorded with the county recorder, which would be unnecessary unless it was intended to run with the land and be binding.*

*Appellant's Reply Br.* at 21-22 (emphasis added).

[39] MGPI also argues that the vested interest in the District passed to it via the successive deeds and contracts that eventually resulted in MGPI's purchase of the distillery. MGPI highlights the following language in the 1972 Contract: "Seagram . . . shall have a vested interest in the respective allocation of design capacity . . . of which it may not be divested of said interest without its consent." *Appellant's App. Vol. II* at 78. MGPI claims it stands in the shoes of Seagram and bears the same rights that Seagram did, and contends this vested capacity was part of the exchange that led to the creation of the District. MGPI also argues that its predecessors became part of the District by paying for part of the infrastructure the District needed to operate. *Appellant's App. Vol. III* at 102-03.

[40] MGPI observes that the deeds by which the distillery was transferred included explicit statements that made the deeds subject to the 1972 Contract and the

2002 Contract. In the latter contract, Pernod and the District agreed that Pernod would hold a vested interest in the District. *Appellant's App. Vol. II* at 99. MGPI notes that the deeds for each sale of the distillery state that the distillery is conveyed subject to the "[c]ontract between the City of Lawrenceburg, the City of Aurora, the City of Greendale, [Pernod] and [the District]." *Id*. at 127, 157.

[41] The District responds that MGPI has no vested interest in the District and that it never had such an interest. First, the District argues that the relevant exception in the deed did not sufficiently manifest an intent to assign the vested interest. The District is referring to Exception 20 to the deed by which Pernod conveyed the distillery to LDI, which stated: "Contract between the City of Lawrenceburg, the City of Aurora, the City of Greendale, [Pernod], and [the District], recorded December 22, 2002 in Official Record Book 56, Page 1392 of the Dearborn County, Indiana." *Id*. at 127. Similarly, the District argues that the deeds did not incorporate the exception by reference. The District contends that it was necessary for MGPI to produce a formal assignment of rights to establish such an intent.

[42] "In determining whether an assignment has been made, the question is one of intent. A written agreement assigning a subject matter must manifest the assignor's intent to transfer the subject matter clearly and unconditionally to the assignee." *E & L Rental Equip., Inc. v. Gifford*, 744 N.E.2d 1007, 1011 (Ind. Ct. App. 2001). The District argues that the only reasonable interpretation of Exception 20 is that it refers to exceptions to the warranty of title granted in the

LDI deed itself (the deed by which LDI acquired the distillery from Pernod). In support, it relies on the following authority: *American Energy Corp. v. Datkuljak*, 882 N.E.2d 463, 477 (Ohio Ct. App. 2007) ("An exception is the retention of an existing right or interest, by and for the grantor, in real property being granted to another."); *Ashcroft v. Eastern Railroad Co.*, 126 Mass. 196, 198 (Mass. 1879) ("The operation of an exception in a deed is to retain in the grantor some portion of his former estate, which by the exception is taken out of or excluded from the grant . . . ."); *Exception*, Black's Law Dictionary (10th ed. 2014) ("The retention of an existing right or interest, by and for the grantor, in real property being granted to another.").

[43] The District also argues that Pernod gave away its vested right, so the exception to the deed that MGPI claims passed along the vested right had no effect. In support, the District relies on the testimony of Neyer, the plant manager of the District's sewage treatment facility:

> During the change of ownership between the predecessor of LDI to MGPI, there were several changes. Instead of being an owner which had a shared interest in all capital projects, they became a retail customer. They also gave up their seat on the board, as well, as part of that change. So, they no longer had a voting interest, they no longer had capital responsibility and they paid up on all the outstanding debt that they had.

*Appellant's App. Vol. III* at 68.

[44] The District additionally argues that through various user agreements, MGPI surrendered all ownership interests, again relying on Neyer's testimony:

> MGPI . . . very early [after] they took ownership, they did not
> want to own a wastewater plant or have part ownership and
> liability for it, so they fulfilled all their obligations to the facility
> for any debt that they were a party to and ceded their ownership,
> which was then uniformly split between the remaining three
> members.

*Id.* at 58. Neyer then testified that after MGPI surrendered its ownership interest, it signed a contract with the District in 2011 that expired at some point in 2013. *Id.* at 58-59. The District also highlights the September 18, 2017 letter from the District's attorney to Ken Carrier of MGPI, in which the District's attorney alleged that MGPI had surrendered its ownership interest in the District: "*Just as MGPI at one time decided it no longer wanted to be a co-owner of [the District],* so the [District] Board has decided that they would no longer have any 'customers' other than [Lawrenceburg, Greendale, and Aurora]." *Id*. at 147 (emphasis added).

[45] We reject MGPI's argument that the vested interest ran with the land. In *Columbia Club, Inc. v. American Fletcher Realty Corp.*, 720 N.E.2d 411, 418 (Ind. Ct. App. 1999), *trans. denied*, this court stated that even if the parties intend for an interest to run with the land, that interest will not run with the land if it does not concern some interest or estate in the land itself.

> Analysis of a covenant to determine whether it runs with the land
> typically involves two inquiries: (1) whether the covenant is one
> which, under any circumstances, may run with the land; and (2)
> whether it was the intention of the parties as expressed in the
> agreement that it should run with the land. *Conduitt [v. Ross],* 26
> N.E. 198 [(Ind. 1885)]. The Indiana Supreme Court has held

that "[a] covenant may contain apt words to make it a continuing covenant, *yet if its nature or the subject matter of it is such that it does not concern some interest or estate in land, either existing or created by it, it cannot run with the land*." *Id.* at 199.

*Id*. at 418 (emphasis added). A covenant running with the land is a covenant "intimately and inherently involved with the land, and therefore binding subsequent and successor grantees indefinitely, which cannot be separated from the land and transferred without it. The chief examples are these: 1) covenants for the building and use of walls; 2) covenants for the building and use of party-walls; 3) covenants for leaving open of ways or parks; 4) covenants restricting buildings to a particular line; and 5) covenants restricting the kinds of buildings in a specified locale." *Covenant Running with The Land*, Black's Law Dictionary (10th ed. 2014).

[46]     *Columbia Club* held that a covenant would run with the land where: "(1) the covenantor and covenantee intend it to run; (2) *the covenant touches and concerns the land*; and (3) there is privity of estate between subsequent grantees of the original covenantor and covenantee." *Columbia Club,* 720 N.E.2d at 418 (emphasis added) (citing *Moseley v. Bishop,* 470 N.E.2d 773, 776 (Ind. Ct. App. 1984)). *Columbia Club* then explained that a covenant touches and concerns the land only if the covenant is logically connected to the property:

> Unless a real covenant's benefit "touches and concerns" some estate in land, the benefit cannot run to the covenantee's grantee. Similarly, unless the burden "touches and concerns" some estate in land, the burden cannot run. We have held that the "touch and concern" requirement ensures that one purchasing land will

be bound by his grantor's contract only where the contract has some logical connection to his use and enjoyment of the land. *Moseley,* 470 N.E.2d at 777. Therefore, a successor to the covenantor's interest in property may be bound by the covenant if it is logically connected to that property interest. *Id.* Conversely, *a successor to the covenantee's property interest may enforce the covenant if it is logically connected to his property*. *Id.* The "touch and concern" requirement is the only essential requirement for the running of covenants which focuses on an objective analysis of the contents of the covenant itself, rather than the intentions and relationships between the parties.

The clearest example of a covenant that "touches and concerns" the land is one which calls for a party to do, or refrain from doing, a physical act on the land. We have held that a covenant to maintain a tile drain was logically connected to the land because the drain was buried on the land. *Id.* Moreover, the Indiana Supreme Court held that a covenant to pay for any additions made to a party wall ran with the land because the covenant was created in the instrument that created the right to use the wall. *Conduitt,* 26 N.E. at 199.

*Columbia Club, Inc.*, 720 N.E.2d at 420-21 (emphasis added).

[47] In *Columbia Club*, we found that an indemnification clause touched and concerned the land and thus ran with the land. In that case, the downtown Indianapolis Columbia Club and several real estate developers entered an agreement related to the construction of the Bank One Tower on property next to the Columbia Club's property. In the agreement, Columbia Club granted easements to the developers that were necessary for the developers to complete construction, and the developers agreed to indemnify Columbia Club for any damages to Columbia Club's property from the construction. At some point,

Columbia Club discovered damage to its property from the construction project and sued the developers. The developers, however, had sold their interests to a third party. In affirming the trial court's grant of summary judgment to the developers, we held that the developers were no longer responsible for damage to the Columbia Club's property because both the easement that Columbia granted to the developers and the indemnification clause "touched and concerned" the land and now belonged to the third party that had purchased Bank One Tower. We explained:

> We believe that the covenant to indemnify the Columbia Club for damages arising from construction of the Bank One Tower and accompanying parking garage is logically connected to both the Columbia Club's property upon which the social club is built and the property upon which the Bank One Tower and accompanying parking garage is built. Thus, we hold as a matter of law that the "touch and concern" requirement is satisfied for the covenant to run with the land.

*Id.* at 421.

[48] As noted in *Columbia Club*, both *Moseley* and *Conduitt* addressed the touch-and-concern requirement. In *Moseley*, we held that the requirement was fulfilled with a covenant to maintain a tile drain on farmland because the covenant was logically connected both to property in which the drain was buried and to land served by the drain. *Moseley*, 470 N.E.2d at 777. In *Conduitt*, our Supreme Court held that a covenant to pay for any additions made to a party wall touched and concerned the land because the covenant was created in the instrument that created the right to use the wall. *Conduitt*, 26 N.E. at 199.

[49] Here, we conclude that the vested interest in the District did not touch and concern the land. It was not, in and of itself, logically connected to the land, nor was it inherently involved with the land. The vested interest was an interest created in a separate entity, the District and the District's physical plant. The 1972 Contract makes this clear: Seagram "shall have a vested interest in the respective allocation of design capacity as set forth in Item 9.2 of this agreement of which it may not be divested of said interest without its consent." *Appellant's App. Vol. II* at 78. While the vested interest undoubtedly served Seagram's commercial interests, this does not mean that the vested interest was logically related to the land or an interest that inhered in the land itself. The vested interest did not touch or concern the land.

[50] *Columbia Club*, *Moseley*, and *Conduitt* reinforce our conclusion. *Columbia Club* observed that the clearest example of a covenant touching and concerning the land is a covenant that calls a party to do, or refrain doing, a physical act on the land. *Columbia Club*, 770 N.E.2d at 420-21. *Moseley* involved such a covenant because it required maintaining a drainage tile on farmland was thus inherently connected to the farmland. *Moseley*, 470 N.E.2d at 777. Likewise, *Conduitt* involved such a covenant because it required payments for additions to a wall where the covenant was created in the document that created the right to use the wall. *Conduitt*, 26 N.E. at 199. The easement and indemnification clause in *Columbia Club* were inherently connected to the Columbia Club's property. *Columbia Club*, 720 N.E.2d at 421. Here, however, the logical connection between the vested interest in the District and the land is wholly lacking. The

vested interest did not touch or concern the land and did not pass to MGPI as a covenant that ran with the land.

[51] We also reject MGPI's argument that it holds the vested interest in the District because of the series of deeds and contracts that eventually resulted in MGPI's purchase of the distillery. Even if, at one point, MGPI held the vested interest through these contracts and deeds, MGPI eventually disclaimed that interest. Neyer, the plant manager for the District's sewer facility, testified:

> MGPI . . . did not want to own a wastewater plant or have part ownership and liability for it, so they fulfilled all their obligations to the facility for any debt that they were a party to and ceded their ownership, which was then uniformly split between the remaining three members.

*Appellant's App. Vol. III* at 58. Neyer also testified that MGPI became a retail customer of the District. *Id.* at 68. Further, the September 18, 2017 letter from the District's attorney to Ken Carrier of MGPI also stated that MGPI had surrendered its ownership interest in the District: "*Just as MGPI at one time decided it no longer wanted to be a co-owner* of [the District], so the [District] Board has decided that they would no longer have any 'customers' other than [Lawrenceburg, Greendale, and Aurora]." *Id.* at 147 (emphasis added).

[52] In its reply brief MPGPI argues, for the first time, that Neyer's testimony was not competent evidence: "Mr. Neyer is a stranger to these transactions and does not even purport to address the language of the deeds. His lay understanding cannot override the legal question to be determined by

examining the language of the deeds themselves." *Appellant's Reply Br.* at 22. Not only did MGPI fail to object to Neyer's testimony, MGPI has failed here to support its challenge to Neyer's testimony with cogent argument. Therefore, MGPI's claim that Neyer's testimony was not competent evidence is waived. *See Basic v. Amouri*, 58 N.E.3d 980, 984-85 (Ind. Ct. App. 2016).

[53] Furthermore, Neyer's testimony and the letter from the District's attorney are sufficiently competent to provide rational support for the decisions of the District Authority and the trial court. *See Yankee Park*, 891 N.E.2d at 1030-31. Evidentiary standards are relaxed in administrative proceedings. *See Oriental Health Spa v. City of Fort Wayne*, 526 N.E.2d 1019, 1022 (Ind. Ct. App. 1988), *trans, denied*; *see also Guy v. Universal Atlas Cement Co., Div. of U. S. Steel Corp.*, 143 Ind. App. 318, 321, 240 N.E.2d 497, 498 (1968). Neyer's testimony and the letter to Ken Carrier meet this relaxed standard. Thus, the decisions of the District Authority and the trial court to uphold the Ordinance on this ground were not arbitrary and capricious or patently unreasonable but were supported by a rational basis. *See Yankee Park*, 891 N.E.2d at 1030-31.

## IV. Is the Ordinance Arbitrary and Capricious?

[54] MGPI contends that the Ordinance is arbitrary and capricious because it results in rates that are not just and equitable. We "will not intervene in a local legislative process [if it is] supported by some rational basis." *Borsuk v. Town of St. John*, 820 N.E.2d 118, 122 (Ind. 2005). We will find a municipal entity's action arbitrary or capricious only if it is "patently unreasonable." *South Gibson*

*Sch. Bd. v. Sollman,* 768 N.E.2d 437, 441 (Ind. 2002). In short, "[j]udicial review of whether a governmental agency has abused its rulemaking authority is highly deferential." *Ind. High Sch. Athletic Ass'n, Inc. v. Carlberg,* 694 N.E.2d 222, 234 (Ind. 1997).

[55] MGPI relies on the testimony of its expert, Roper, to establish that the rates are arbitrary and capricious. Roper addressed three factors that resulted in an improper rate calculation. First, Roper maintained that the Ordinance would result in overcollection of revenue because the Cost of Service Study abandoned the biological oxygen demand ("BOD") method for setting rates and replaced it with loading rates based on pounds of "total loadings." *Appellant's App. Vol. III* at 225-26. The Ordinance defines "total loadings" as "pounds . . . calculated from BOD and TSS," where TSS stands for "total suspended solids" or "the total suspended matter that floats on the surface of, or is suspended in: water, wastewater, or other liquid[.]" *Id.* at 21. Roper explained that the "total loading" charges are not limited to BOD but are based on BOD and TSS combined. *Id.* at 225. Roper claimed that although the District switched to this total-loadings standard, it did not conduct a separate analysis to determine what the total loadings rate should be because the Ordinance simply incorporated the $0.30 per pound BOD charge into the new framework measuring total loadings. *Id.* at 13-15, 18-21. Roper claimed this would result in an overcollection of more than half a million dollars. *Id.* at 225-26.

[56] Second, Roper claimed that the Cost of Service Study improperly calculated a rate based on the costs of removing phosphorus from wastewater. *Id.* at 226-27.

MGPI contends phosphorous removal should not factor into its rates because MGPI discharges no phosphorus into its wastewater. *Id.* at 227. Third, Roper contended that the Cost of Service Study failed to apply guidelines promulgated by the EPA, which again will result in overcharges. *Id.* at 228-30. Roper referred to EPA guidelines for pH testing of wastewater discharges. *Id.* at 229-30. This standard requires what is known as a "grab sample." *Id.* However, Roper explained, the Ordinance deviates from this guideline by using "composite samples" collected over twenty-four hours. *Id.* Because pH samples of wastewater are unstable over time, Roper explained it is important that only fresh samples are tested. *Id.* at 230. Using composite samples reduces the accuracy of the tests at the risk of the consumer. *Id.* Thus, Roper described the method used by the District as a "short-cut protocol." *Id.* at 233.

[57] Based on these alleged problems with the Cost of Service Study, Roper calculated that MGPI's rates would be higher under the Ordinance. He found that while MGPI discharges only about twenty-nine percent of the total wastewater load in the system, it would provide forty percent of the District's revenue. *Id.* at 230.

[58] In response, the District correctly observes that MGPI's argument asks us to reweigh the evidence instead of using the highly deferential standard of asking whether the Ordinance was arbitrary and capricious. *See Carlberg*, 694 N.E.2d at 234. The District highlights evidence that supported the rulings below. First, the District's expert, Skomp, testified that the Ordinance would produce adequate, not excessive revenue. *Id.* at 36-37. Skomp explained that the

estimated annual revenue from the rates is within $6,400 or 0.2% of the estimated annual revenue requirement. *Id*. at 39-40. Second, Skomp clarified why phosphorous removal is included in rate calculation for all users even though MGPI discharges no phosphorous into its wastewater. He explained that phosphorus removal costs were allocated this way because all flow, except for stormwater-only flow, goes through the phosphorus removal process and the phosphorous content of incoming flow is irrelevant. *Id*. at 159.

[59] Third, the District rejects MGPI's argument that the Ordinance is arbitrary and capricious because it allows the District to use alternatives to grab-sample testing when necessary. The District argues that the Ordinance makes clear that pH is to be tested by the grab-sample method: "the pH from any 24-hour grab sample shall not be outside the range of 5.5-9.5." *Appellant's App. Vol. II* at 166. However, even if a grab sample is sometimes impractical to collect, which the District contends is highly unlikely, allowing the use of a composite sample should not invalidate the Ordinance. At most, the District argues that the language allowing for composite sample testing should be stricken from the Ordinance. Further, the District claims MGPI has not alleged or presented any evidence that the District has ever tested pH via a composite sample. Thus, it argues that MGPI's argument here is hypothetical and not ripe for review. *See In re Paternity of M.G.S*, 756 N.E.2d 990, 1004 (Ind. Ct. App. 2001), *trans. denied*.

[60] Finally, the District rejects MGPI's argument that the Ordinance is arbitrary and capricious because it will supposedly result in MGPI providing forty percent of the District's revenue while only discharging twenty-nine percent of

the District's total wastewater load. The District claims that MGPI's argument is specious because MGPI would not be subject to the Ordinance's rates, but since MGPI is now a direct customer of Lawrenceburg, MGPI's rates will be set by Lawrenceburg, not the Ordinance. Skomp's Supplement stated: "the rates and charges approved in the Ordinance . . . would not be applied to a bill to MGPI and[,] therefore, cannot be used to determine how MGPI will be impacted." *Appellant's App. Vol. III* at 162.

[61] The evidence provided a rational basis for the Ordinance. Accordingly, we reject MGPI's argument that the Ordinance is arbitrary and capricious.

## VI. Conclusion

[62] There was a rational basis for the District Authority to uphold the Ordinance and for the trial court to affirm the District Authority's ruling. Thus, we decline to intervene in this local, legislative matter. *See Yankee Park*, 891 N.E.2d at 1030-31. The District was not required to obtain permission from IDEM to enact the Ordinance, the District considered MGPI's interests in enacting the Ordinance, and the Ordinance was not arbitrary and capricious. Finally, the vested interest did not run with the land to MGPI and even if MGPI once held the vested interest through the series of sales of the distillery that eventually resulted in MGPI's purchase of the distillery, MGPI eventually disclaimed that vested interest. Accordingly, we affirm the trial court.

[63] Affirmed.

Baker, J., and Crone, J., concur.